UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

———————————————————

K.R. JONES,                                              Civil No. 11-616 (MJD/AJB)

       Plaintiff,

    v.                                                **REPORT AND RECOMMENDATION**

T. HARCEY, (C?) WALLACE,
T. MILLER, (UNKNOWN), T. LEWIS,
J. BAKKER, J. HARE and
JOHN/JANE DOE,

       Defendants.

———————————————————

Kelly R. Jones, Federal Correctional Institution - Butner, P.O. Box 1000, Butner, North Carolina, 27509, Plaintiff, pro se.

Mary Jo Madigan, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, 55415, for Defendants.
———————————————————————————

ARTHUR J. BOYLAN, Chief United States Magistrate Judge

Plaintiff, a federal prisoner, commenced this action by filing a self-styled civil complaint seeking relief under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). (Docket No. 1.) Plaintiff is attempting to sue six employees of the Federal Bureau of Prisons, ("BOP"), who allegedly violated his federal constitutional rights while he was being detained at the Federal Medical Center in Rochester, Minnesota, ("FMC-Rochester"). Defendants have filed a motion to dismiss, or alternatively, for summary judgment, (Docket No. 16), and Plaintiff has opposed the motion by filing a five-page reply memorandum, (Docket No. 28).

The matter has been referred to this Court for a report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons discussed below, the Court will recommend that Defendants' motion for summary judgment be granted, and that this action be dismissed with prejudice.[1]

## I. BACKGROUND

In October 2004, Plaintiff entered a guilty plea in the United States District Court for the Southern District of Florida to charges of conspiracy to possess child pornography and conspiracy to obstruct justice.  United States v. Jones, 200 Fed.Appx. 915, 917 (11th Cir. 2006), (unpublished opinion), cert. denied, 549 U.S. 1231 (2007).  He was sentenced to 293 months in federal prison for those offenses.  He also was sentenced to an additional twelve months in prison for violating the conditions of his supervised release for a prior conviction involving an attempt to entice a minor to engage in sexual activity via the

---

[1]  Plaintiff's complaint indicates that he is also attempting to sue a Defendant identified as "(UNKNOWN), Administrative Remedy Coordinator." The moving Defendants in this case have suggested that this action should be dismissed as to "(UNKNOWN) Administrative Remedy Coordinator" for lack of personal jurisdiction, because Plaintiff has not effected service of process on this Defendant.  The Court agrees.  The 120-day deadline for serving this Defendant expired long ago, and Plaintiff has filed no proof of service, nor has he offered any reason to believe that this Defendant has been served or will be served.  The Court will therefore recommend that this action be dismissed against Defendant "(UNKNOWN) Administrative Remedy Coordinator," pursuant to Fed. R. Civ. P. 4(m), unless Plaintiff immediately shows cause why that should not occur.

The complaint also indicates that Plaintiff is attempting to sue one or more individuals identified as "John/Jane Doe."  (Complaint, p. 2, ¶ 3.)  According to the complaint, "John/Jane Doe, is person(s) whose name(s) is unknown to Plaintiff, who it may be discovered has personal involvement in the events described herein." (Id.)  The Court will recommend that this action be dismissed against Defendant(s) John/Jane Does, because Plaintiff has failed to allege any facts that could support any cause of action against any such Defendant(s).  See 28 U.S.C. § 1915A(b)(1) (directing federal courts to dismiss any portion of a prisoner complaint that fails to state a cause of action on which relief can be granted).

internet.  (Declaration of Todd Miller, [hereafter "Miller Decl."], [Docket No. 18], p.1, ¶ 2.)
Thus, Plaintiff is currently serving an aggregate prison term of 305 months.  His projected
release date is October 23, 2026.  (Id.)

Plaintiff served his federal prison sentence at FMC-Rochester between September
18, 2007, and March 29, 2011.  (Id., ¶ 3.)  He was subsequently transferred to the Federal
Correctional Institution in Butner, North Carolina, which is where he is presently confined.

The six BOP employees that Plaintiff is presently attempting to sue were employed
at FMC-Rochester while Plaintiff was imprisoned there.  Defendant Tim Harcey is a
"correctional officer Senior Officer Specialist," (Declaration of Tim Harcey, [hereafter
"Harcey Decl."], [Docket No. 20], p. 1, ¶ 1); Defendant Thomas Lewis is a correctional
counselor, (Declaration of Thomas Lewis, [hereafter "Lewis Decl."], [Docket No. 23], p. 1,
¶ 1); Defendant Jack Bakker is a correctional counselor, (Declaration of Jack Bakker,
[hereafter "Bakker Decl."] [Docket No. 19], p. 1, ¶ 1); Defendant Chris Wallace is a
correctional officer, (Declaration of Chris Wallace, [hereafter "Wallace Decl."], p. 1, ¶ 1);
Defendant Todd Miller is a "Special Investigative Agent," (Miller Decl., p. 1, ¶ 1); and
Defendant Jason Hare is a correctional lieutenant, (Declaration of Jason Hare; [hereafter
"Hare Decl."], [Docket No. 22], p. 1, ¶ 1).

Plaintiff's complaint in this case presents a sprawling conglomeration of claims
against the six named Defendants.  As noted above, Plaintiff is attempting to sue
Defendants under Bivens for allegedly violating his federal constitutional rights.  Most of
Plaintiff's claims against Defendants are described as "retaliation" claims.

Plaintiff is, by his own admission, an extraordinary complainer.  He alleges that he
has "filed a large number of Administrative Remedy Complaints," ("ARCs"), in which he has

complained about the conditions of his confinement in federal prison.  (Complaint, p. 3, ¶ 6.)  By one tally he had filed 153 ARCs as of November 2010.  (Id.)

In this case, Plaintiff claims that Defendants have retaliated against him for filing his ARCs.  In addition, Plaintiff's complaint includes several vague accusations that Defendants violated his constitutional rights to due process and access to the courts.  Plaintiff also claims that one Defendant (Jason Hare) violated his rights under the First Amendment's freedom of religion clause.  The facts on which Plaintiff's various claims are based will be discussed in greater detail below.

Although Plaintiff has not described any actual injury that he has suffered, he is seeking a judgment against Defendants for "[a]ctual damages to be determined at a later date."  (Complaint, p. 24.)  He is also seeking a separate award for "compensatory damages," and punitive damages, and he is asking for the expungement of a prison disciplinary proceeding that was brought against him.

## II.  STANDARD OF REVIEW

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate if the materials submitted in support of the motion "show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The standards for considering a Motion for Summary Judgment have their foundation in the provisions of Rule 56 of the Federal Rules of Civil Procedure, as interpreted in a trilogy of cases decided by the Supreme Court in 1986.  In one of those cases, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986), the Supreme Court described the importance of the summary judgment procedure:

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' . . . Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."

On a Motion for Summary Judgment, the moving party has the initial burden of establishing the "material facts" and demonstrating that there is not a "genuine" dispute as to whether those material facts are true. Fed. R. Civ. P. 56(c). To defeat the motion, the opposing party must then establish that there is a "genuine" issue as to material facts.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Fed. R. Civ. P. 56(e). If a motion for summary judgment is properly supported by affidavits or other evidence, the nonmoving party must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. Id. at 587; Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 585 (8th Cir. 1987), cert. denied, 484 U.S. 1010 (1988). Although the evidence is examined in the light most favorable to the non-moving party, the non-moving party may not rely on conclusory allegations or denials. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Lambert v. City of Dumas, 187 F.3d 931, 934-35 (8th Cir. 1999).

The moving party is entitled to summary judgment when the non-movant fails to establish the existence of an essential element of a claim on which that party has the burden of proof at trial. Celotex Corp., 477 U.S. at 322. No genuine issue of material fact

exists absent such foundation because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587.   The Court considers the motion for summary judgment based upon the material presented in connection with the motion.   "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.   The Court's inquiry should be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

The Court is mindful that pro se pleadings should be liberally construed.  Haines v. Kerner, 404 U.S. 519, 520 (1972); White v. Bond, 720 F.2d 1002, 1003 (8th Cir. 1983). Therefore, pro se pleadings are held to less stringent standards when challenged by motions to dismiss or for summary judgment.  Haines, 404 U.S. at 520; Horsey v. Asher, 741 F.2d 209, 211 n.3 (8th Cir. 1984).   Nevertheless, even a pro se party who opposes summary judgment "is not permitted to merely rest on his pleadings but must instead set forth sufficient evidence from which a reasonable jury could find in his favor on all elements of his claims." Johnson v. Hamilton, 452 F.3d 967, 972 (8th Cir. 2006).

## III. DISCUSSION

As previously noted, most of Plaintiff's claims in this case are "retaliation" claims.

The Court will therefore begin the analysis of Plaintiff's lawsuit with a general review of the legal principles that govern retaliation claims.  The Court will then consider the allegations and evidence pertaining to Plaintiff's specific retaliation claims against each of the individual Defendants.  Plaintiff's other constitutional claims against the various Defendants will also be considered.[2]

A.  <u>Constitutional Protection Against Retaliation</u>

"'It is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable ..., even if the act when taken for a different reason, would

---

[2]  Defendants have argued that many of Plaintiff's claims should be summarily dismissed, because he failed to exhaust his available administrative remedies, as required by 42 U.S.C. § 1997e(a).  However, the record shows that Plaintiff has pursued his available administrative remedies for many of his claims, and it would be very difficult, in this particular case, to sort out exactly which of Plaintiff's current claims were presented with adequate specificity in Plaintiff's various administrative grievances.  As the Eighth Circuit Court of Appeals has pointed out –

"'[E]xhaustion [as required by the PLRA] is not <u>per</u> <u>se</u> inadequate simply because an individual later sued was not named in the grievance[ ]' filed by an inmate....  Instead, the [Supreme] Court [has] ruled that the degree of specificity required in a prison grievance 'will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.'"

<u>Abdul-Muhammad v. Kempker</u>, 486 F.3d 444, 446 (8th 2007), quoting <u>Jones v. Bock</u>, 549 U.S. 199, 218-19 (2007).  In this case, Defendants have not addressed the "degree of specificity" required by the BOP's administrative remedy procedures.  And again, it is simply not clear how all of the claims presented in Plaintiff's various administrative grievances would "match up" with all of the claims presented here.  Thus, for now, the Court will assume (without deciding) that Plaintiff has exhausted his administrative remedies, and the claims listed in the current complaint will therefore be addressed on the merits.  <u>See</u> <u>Barrett v. Acevedo</u>, 169 F.3d 1155, 1162 (8th Cir.) ("[a]lthough [in a habeas corpus context] the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated"), <u>cert</u>. <u>denied</u>, 528 U.S. 846 (1999); <u>see</u> <u>also</u> <u>Chambers v. Bowersox</u>, 157 F.3d 560, 564 n. 4 (8th Cir. 1998) ("[t]he simplest way to decide a case is often the best"), <u>cert</u>. <u>denied</u>, 527 U.S. 1029 (1999).

have been proper.'" Craft v. Wipf, 836 F.2d 412, 419 (8th Cir. 1987), quoting Buise v. Hudkins, 584 F.2d 223, 229 (7th Cir. 1978), cert. denied, 440 U.S. 916 (1979).  Prisoners have a First Amendment right to file complaints under available prisoner grievance procedures.  Nelson v. Shuffman, 603 F.3d 439, 449 (8th Cir. 2010) ("[a] prisoner's right under the First Amendment to petition for redress of grievances under a prison's grievance procedures is clearly established in this court").  Therefore, actions taken against a prisoner in retaliation for filing an administrative grievance can give rise to an actionable civil rights claim.  Id. at 450 ("actions taken in retaliation for an inmate's filing of a grievance are actionable under 42 U.S.C. § 1983").

Many prisoner retaliation claims are based on allegations of unwarranted disciplinary charges.  In such cases, the prisoner typically contends that he has been unjustly accused of violating prison rules in retaliation for filing complaints under the prison's grievance procedures.  See e.g., Hartsfield v. Nichols, 511 F.3d 826, 829 (8th Cir. 2008) ("[a]n inmate may maintain a cause of action for retaliatory discipline under 42 U.S.C. § 1983 where a prison official files disciplinary charges in retaliation for an inmate's exercise of constitutional rights"); Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) (filing disciplinary charges against a prisoner, "is actionable under section 1983 if done in retaliation for his having" attempted to exercise his right to file a grievance); Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990) (same).

In other retaliation cases, prisoner-plaintiffs have complained about being transferred to a less desirable penal facility after attempting to exercise some constitutional right.  See Murphy v. Missouri Dept. of Correction, 769 F.2d 502, 503 (8th Cir. 1985) ("[w]hile a prisoner enjoys no constitutional right to remain in a particular institution and generally is

8

not entitled to due process protections prior to such a transfer..., prison officials do not have the discretion to punish an inmate for exercising his first amendment rights by transferring him to a different institution") (citations omitted); <u>Goff v. Burton</u>, 7 F.3d 734, 737 (8th Cir. 1993) ("a prisoner cannot be transferred in retaliation for the exercise of a constitutional right"), <u>cert</u>. <u>denied</u>, 512 U.S. 1209 (1994); <u>Ponchik v. Bogan</u>, 929 F.2d 419, 420 (8th Cir. 1991) (same); <u>Henderson v. Baird</u>, 29 F.3d 464, 469 (8th Cir. 1994), <u>cert</u>. <u>denied</u>, 515 U.S. 1145 (1995) (same).

While most prisoner retaliation claims stem from either (a) disciplinary charges or (b) prison transfers, retaliation claims can be based on other actions by prison officials that adversely affect a prisoner. <u>See</u> <u>e.g.</u>, <u>Cooper v. Schriro</u>, 189 F.3d 781, 784 (8th Cir. 1999) (<u>per</u> <u>curiam</u>) (allegation that correctional officer shut off prisoner's water supply was sufficient to state an actionable retaliation claim); <u>Lewis v. Jacks</u>, 486 F.3d 1025, 1029 (8th Cir. 2007) ("[r]etaliatory action that worsens an inmate's working conditions can be sufficiently adverse to be actionable under § 1983"); <u>Nelson</u>, 603 F.3d at 450 (depriving a prisoner of "access to legal counsel, mail, family, recreation, and phone calls" can have a sufficiently adverse affect to support a retaliation claim).  Even a mere threat of retaliation can, under certain circumstances, support an actionable retaliation claim.  <u>Burgess v. Moore</u>, 39 F.3d 216, 218 (8th Cir. 1994) ("a threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedure").  It is important to note, however, that not every adverse circumstance encountered by a prisoner will support an actionable retaliation claim.  A prisoner must prove that allegedly retaliatory action was severe enough to "chill an inmate of ordinary firmness from filing grievances." <u>Lewis</u>, 486 F.3d at 1029.  <u>See</u> <u>also</u> <u>Williams v. Horner</u>, 403 Fed.Appx. 138, 142 (8th Cir. 2010) (<u>per</u>

9

curiam) (unpublished opinion), (Colloton, J., concurring in part, and dissenting in part) (prisoner's allegation that prison official "filed a single retaliatory charge, which the warden personally agreed to dismiss within four days of the charge, does not plausibly state a claim of retaliation that would deter an inmate of ordinary firmness from filing future prison grievances").

A prisoner bringing a retaliation claim must show that the purpose of the defendant's alleged retaliatory action was to punish the prisoner for attempting to exercise his constitutional rights.  More specifically, the prisoner must show that he would not have suffered the alleged retaliatory mistreatment at issue "but for" the defendant's retaliatory motive.  Thus, when a prisoner claims that he was disciplined for exercising his First Amendment rights, he must satisfy the "heavy burden of showing that the prison officials who disciplined him had an impermissible motive for doing so, and that but for this impermissible motive, the disciplinary charges would not have been brought."  Orebaugh, 910 F.2d at 529 (emphasis added).  See also Kind v. Frank, 329 F.3d 979, 981 (8th Cir. 2003) (prisoner's retaliation claim was properly dismissed where he "failed to show that but for his assertions of his constitutional rights, he would not have been transferred"); Hazen v. Reagen, 16 F.3d 921, 926 (8th Cir. 1994) ("for an inmate to prove that his transfer was in retaliation for the exercise of First Amendment rights, he must establish that he would not have been transferred 'but for' the retaliatory reason"); Sisneros v. Nix, 95 F.3d 749, 752 (8th Cir. 1996) ("[i]n a retaliatory transfer case, 'the burden is on the prisoner to prove that but for an unconstitutional, retaliatory motive the transfer would have not occurred'"), (quoting Goff, 7 F.3d at 738).

10

Guided by the foregoing recitation of the law governing retaliation claims, the Court considers Plaintiff's current claims against each of the six individual Defendants in this case.

B. <u>Claims Against Defendant Harcey</u>

It appears that most of Plaintiff's current lawsuit has emanated from a petty dispute in about when the lights should be turned off at night in Plaintiff's living quarters at FMC-Rochester.  In July 2008, Plaintiff wanted the lights left on until midnight, but Defendant Harcey insisted on turning them off at 10:00 p.m. (Complaint, pp. 4-5, ¶s 14-25.)  Using the prison grievance procedures, Plaintiff submitted an ARC complaining about Harcey's practice of shutting off the lights.  Sometime thereafter, Harcey allegedly chastised a group of inmates for "writing him up" about the lights issue, and allegedly told the inmates "'I know who's responsible for it and I'll make sure he gets what's coming to him because what goes around comes around.'"  (<u>Id</u>., pp. 6-7, ¶s 30-33.)

**(i) cell search**

Soon after Harcey allegedly talked to the inmates about the lights issue, Plaintiff found that Harcey had searched his "bed and property" and left them "in complete disarray."  (<u>Id</u>., p. 6, ¶ 34.)  Plaintiff claims that Harcey's search violated his constitutional rights, because Harcey was retaliating against him for filing an ARC regarding the lights.  However, Harcey has effectively disproven Plaintiff's retaliation claim, by showing that he was not only authorized to search Plaintiff's cell, but he was, in fact, <u>required</u> to search the cell as part of his duties as a correctional officer.  As explained by Harcey:

> I did search [Plaintiff's] room on July 15, 2008, but I never conducted that search simply because [Plaintiff] had complained to me and others about the above issue [i.e., the lights].  I had never searched [Plaintiff's] room prior to

11

July 15, 2008, even though I began working on the unit on June 30, 2008.
<u>I was required to conduct searches as part of my assigned duties</u>.  Even
though I discovered that he possessed what I regarded as nuisance
contraband during the search, I did not issue an incident report to [Plaintiff].
He was not subjected to retaliatory discipline concerning the July 15, 2008,
search I conducted because I never issued an incident report to him.  I
merely confiscated the nuisance contraband."

(Harcey Decl., p. 4, ¶ 13; [emphasis added].)

Defendant Miller has confirmed that "Harcey was authorized to search [Plaintiff's]

room to discover contraband and a legitimate reason existed for the seizure of some of

[Plaintiff's] property."  (Miller Decl., p. 6, ¶ 16.)

Because the record shows that the search of Plaintiff's cell was fully authorized and

fully appropriate, Plaintiff is unable to sustain his initial retaliation claim.  This retaliation

claim fails, because Plaintiff is unable to satisfy the "but for" requirement.  In other words,

he is unable to show that Harcey would not have searched his property "but for" a

retaliatory motive.  Because the record shows that Harcey had sufficient reason to search

Plaintiff's cell and seize unauthorized property, Plaintiff cannot show that the search would

not have occurred "but for" a retaliatory purpose.  Therefore, Plaintiff's retaliation claim

based on the search of his cell must be rejected.  <u>See</u> <u>Rustan v. Rasmussen</u>, No. 99-3283

(8th Cir. 2000), 2000 WL 227987 (unpublished opinion) at *2 (frequent retaliatory cell

searches may violate the Constitution, but isolated searches do not).

### (ii) SHU Incident Report

Plaintiff alleges that on September 8, 2008, he was taken to a special housing unit,

("SHU").[3]  After Plaintiff arrived there, Harcey conducted an inventory of his property.

_____

[3]  Plaintiff was placed in SHU "for an investigation concerning an allegation that he
made a sexual proposal to an inmate."  (Miller Decl. p. 6, ¶ 17.)  It appears that Harcey

(Complaint, pp. 6-7, ¶ 41.)  The following day, Harcey filed an "incident report," bringing disciplinary charges against Plaintiff for "Possession of anything not authorized."  (Id., p. 7, ¶ 42.[4])  Plaintiff claims that the inventory and disciplinary charges were further acts of retaliation, presumably for the ARC that Plaintiff had previously filed about the lights issue.

Harcey contends that the SHU inventory was well-justified, and not retaliatory, because "[w]hen an inmate is confined in the SHU, his property is collected and inventoried because he typically is not allowed to have access to all of his property while he is confined in the SHU."  (Harcey Decl., p. 5, ¶ 18, [citing 28 C.F.R. 541.22]; see also Miller Decl., p. 6, ¶ 17.)  Plaintiff has not disputed that contention.

A Unit Disciplinary Committee, ("UDC"), held a hearing on the disciplinary charge against Plaintiff for possessing unauthorized property, and determined that the charge was valid.  (Harcey Decl., p. 5, ¶ 19; Miller Decl. p. 6, ¶ 17.)  The only sanction imposed by the UDC was a loss of commissary privileges for fourteen days.  (Id.)

Plaintiff attempted to challenge the disciplinary charge by filing another ARC against Harcey.  (See Plaintiff's Exhibits, [Docket No. 1, "Appendix"], pp. 15-16.)  In that ARC, Plaintiff did not deny that he had possessed unauthorized property.  Instead, he merely argued that the disciplinary charge was "a petty shot," that other inmates had not been disciplined for similar offenses, and that he should have received a less serious "401" charge for his offense, rather than a "305" charge.  (Id.)  Plaintiff's ARC was rejected at every level of the BOP's administrative remedy process, because the disciplinary charge

_____

played no role in the investigation, or the decision to assign Plaintiff to the SHU.

[4]  A copy of the incident report is attached to Plaintiff's complaint.  (Plaintiff's Exhibits, [Docket No. 1, "Appendix"], p. 13.)

was found to be adequately supported.  (Id., pp. 17-21.)

Based on the record before this Court, it is readily apparent that the disciplinary charge at issue was valid, and not fabricated for retaliatory purposes.  Again, Plaintiff does not deny that he violated prison rules; he merely disputes the designation of his offense, (i.e., it should not have been called a "305" charge), and he complains that others were excused from similar offenses.[5]  Because the record shows that Plaintiff violated prison rules, his retaliation claim based on that violation must be rejected.  Goff, 7 F.3d at 738 ("if the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail").

### (iii) "Safety and Sanitation" Charge

In February 2009, Plaintiff received another disciplinary charge from Harcey, this time a "Code 317" charge for "Failure to follow safety and sanitation."  (Complaint, p. 9, ¶ 60.)  Even though this incident occurred many months after Plaintiff's previous run-ins with Harcey, Plaintiff still believes that this charge was issued in retaliation for his earlier complaints against Harcey.

Harcey flatly denies that the "safety and sanitation" charge was issued in retaliation for Plaintiff's previous ARCs.  (Harcey Decl. p. 7, ¶ 25.)  Harcey states that he issued the incident report because Plaintiff's "trash can had not been emptied, he had excess property on his desk, his clothes were not stored properly, he had excess property under his bed

---

[5]  Plaintiff has not alleged that Harcey played any role in determining whether he, or any other inmate, was actually guilty of the disciplinary charges at issue.  Nor has Plaintiff alleged that Harcey played any role in determining the sanctions imposed on him or any other inmates.

and his floor needed sweeping." (Id., ¶ 26.)  A UDC determined that Plaintiff was guilty of the charged safety and sanitation offense, and recommended that he should be disciplined. (Id., pp. 9-10, ¶ 62.)

The disciplinary charge was then reviewed by a Disciplinary Hearing Officer, ("DHO"), named B. Auterson.  (Declaration of B. Auterson, [Docket No. 21], p. 1, ¶ 1, p 2, ¶s 6-7.)  DHO Auterson determined that no disciplinary sanctions should be imposed for the charged offense, but that Plaintiff should be given "an official warning." (Id., p. 2, ¶ 7.) DHO Auterson "found no indication that the information in the incident report was false." (Id., ¶ 8.)  Moreover, DHO Auterson has expressly declared that "I would not issue a warning to [Plaintiff] if I believed the incident report was false." (Id.)

The timing of the incident report, coming several months after Plaintiff's earlier ARCs against Harcey, raises serious doubts about Plaintiff's retaliation claim.  Harcey has declared under oath that the condition of Plaintiff's cell was deficient in several respects. (Harcey Decl., p. 7, ¶ 26.)  More importantly, the UDC upheld the incident report, which shows that someone besides Harcey believed there was a rule violation.  Although the DHO declined to impose any actual sanctions in connection with this particular charge, Plaintiff was given an official warning, which, according to the DHO, would not have occurred had a rule violation not been found.[6]  Thus, looking at the record as a whole, the Court finds that Plaintiff's retaliation claim based on the "safety and sanitation" charge is not sustainable.  Again, even though the DHO merely gave Plaintiff a warning, the record shows that a rule violation did occur, and that alone effectively disproves Plaintiff's

---

[6] Harcey has speculated that Plaintiff may have received only a warning because he cleaned up his room after the incident report was issued.  (Harcey Decl. p. 7, ¶ 28.)

retaliation claim.  See Moots v. Lombardi, 453 F.3d 1020, 1023 (8th Cir. 2006) ("[c]onduct violations cannot be deemed retaliatory when they were issued for actual violations of prison rules").

### (iv) Insolence Charge

Immediately after Plaintiff received the incident report for his "safety and sanitation" violation, he encountered a fellow inmate.  As Harcey was watching, Plaintiff told the other inmate that he had just "received a 'bullshit shot' from Harcey."  (Complaint, p. 10, ¶ 63.) Harcey then immediately issued another incident report to Plaintiff, this time charging him with "insolence towards a staff member," a violation of "Code 312."  (Id., ¶ 67; 28 C.F.R. § 541.3, Table 1 ["Prohibited Acts and Available Sanctions"].)  According to Harcey, Plaintiff called him an "asshole," (Harcey Decl., p. 7, ¶ 26), but Plaintiff has denied that allegation. (Complaint, p. 10, ¶ 67.)

The UDC referred the insolence charge to the DHO for further proceedings.  Plaintiff admitted to the DHO that he was angry with Harcey, and he told another inmate, while Harcey was only twenty feet away, that he had received "a bullshit shot" from Harcey. (Auterson Decl., p. 2, ¶ 11.)  The DHO elected to expunge the incident report.  However, the charge was dropped only because the DHO "thought the elements of Code 312, Insolence Towards Staff, required the inmate to speak directly to the staff member, as opposed to overhearing a conversation between inmates."  (Id., ¶ 12.)

Although the DHO ultimately elected not to uphold the insolence charge, it does not follow that the charge must therefore be considered retaliatory.  "The fact that the conduct violation was later expunged does not mean that there was not some evidence for its imposition."  Moots, 453 F.3d at 1023.  In the present case, there clearly was some

evidence to support the insolence charge against Plaintiff.  Although it is disputed whether Plaintiff actually called Harcey an "asshole," Plaintiff candidly acknowledges that he was upset and he verbally denounced an earlier incident report issued by Harcey as "a bullshit shot."  Reasonable minds could, perhaps, disagree about whether Plaintiff's behavior should be characterized as "insolence."  However, Harcey heard Plaintiff's remark first-hand, and he was in the best position to assess the tone of Plaintiff's voice, and his attitude.  Based on Plaintiff's own description of the incident, it was not unreasonable for Harcey to believe that Plaintiff's behavior was insolent, and Harcey's assessment of Plaintiff's demeanor certainly constitutes "some evidence" to support the "insolence" charge against Plaintiff.

Federal prisons cannot function properly unless prisoners show a proper respect for prison officials.  See Cardenas v. Adler, No. 1:09-cv-1793 LJO, (E.D.Cal. 2011), 2011 WL 2785099 at *5 ("[t]he impact of allowing inmates to act in a disrespectful manner towards correctional officers creates potential safety concerns if prisoners do not view officers as being in positions of authority over the inmate population") (Report and Recommendation adopted Aug. 23, 2011, 2011 WL 3687580).  It is therefore reasonable to assume that Code 312 is intended to compel a modicum of respect for the authority of prison officials.  That objective is undermined any time an inmate acts insolently toward a correctional official, whether directly or indirectly.  For this reason, the Court questions the notion that an inmate can violate Code 312 only if the inmate's insolent remarks are delivered directly, face-to-face, to a member of the prison staff.  Indirect insolence certainly could undermine the authority of prison officials, and thus, it would seem, should be punishable under Code 312.  See Jackson v. Hollingsworth, No. Civ. 10-4070-KES, (D.S.D. 2010), 2010 WL

3862564 at *3 (inmate's conduct that "challenged the staff member's authority... can reasonably be interpreted as insolence").

In any event, even though the meaning of the term "insolence" might be debatable, and even though the DHO gave Plaintiff the benefit of the doubt, there is at least some evidence to support Harcey's determination that Plaintiff's conduct violated Code 312. Even if Plaintiff's "bullshit shot" remark was not specifically directed to Harcey, it certainly was a demonstration of disrespect that could reasonably be viewed as "insolence." Therefore, Plaintiff's retaliation claim based on the insolence incident report cannot succeed.  See Moots, 453 F.3d at 1023 ("a defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' that the inmate actually committed a rule violation").

C.  Claims Against Defendant Wallace

On September 7, 2008, a unit manager at FMC-Rochester told Defendant Chris Wallace that she was concerned that Plaintiff "was preying on vulnerable inmates in the Mental Health Unit." (Wallace Decl., p. 5, ¶ 16.)  Wallace was asked to watch Plaintiff, and "report inappropriate conduct." (Id.)  When Wallace subsequently observed Plaintiff sitting close to another inmate, he cautioned Plaintiff about his behavior.  (Id.)  Plaintiff then filed an ARC challenging Wallace's assertion that he had been "trying to 'hustle' another inmate." (Complaint, p. 12, ¶s 83-84.)  Thereafter, Wallace allegedly "started harassing" Plaintiff, and made "threatening remarks and 'snide' and inappropriate comments." (Complaint, p. 12, ¶ 85.)  Plaintiff further alleges that Wallace searched his cell, listened to a conversation that Plaintiff was having with a friend, and told Wallace about another inmate's alleged crimes.  (Id., p. 13, ¶s 86-89.)  Wallace also allegedly eavesdropped on

18

a conversation between Plaintiff and another inmate, and later told the other inmate he should not talk with Plaintiff.  (Id., ¶s 90-91.)  A short time later, Wallace allegedly woke up Plaintiff, and informed him that he had previously searched Plaintiff's cell.  (Id., p. 14, ¶ 92.)

Plaintiff further alleges that Wallace "harassed" him by another cell search, by telling Plaintiff to stop filing "petty complaints," by standing over Plaintiff "in an intimidating manner," by delivering two pieces of mail that appeared to have been opened, and by switching two locks on Plaintiff's locker.  (Id., pp. 14-15, ¶s 93, 98, 100, 102, 109, and 110.) In addition, Wallace allegedly followed Plaintiff around the prison and seemed to be "stalking" him; Wallace allegedly talked about "reading [Plaintiff's] file;" and Wallace allegedly commented to other inmates that Plaintiff is from Florida.  (Id., pp. 16-17, ¶s 115-116.) Based on all of these trivial allegations, Plaintiff claims that Wallace retaliated against him – presumably because of the various ARCs that Plaintiff had filed.

Wallace contends that the actions ascribed to him in Plaintiff's complaint were not retaliatory misdeeds, but rather, they were merely the normal work-related actions of a federal correctional officer.  Simply put, Wallace was just doing his job.  As Wallace has explained in his declaration:

> "As a correctional officer for the BOP at the FMC, my duties include maintaining institution security and good order by conducting searches of inmate property and monitoring the behavior of inmates in housing units where I am assigned to work.  Under 28 C.F.R. 552.14, I am authorized to search an inmate's housing area and work area and his personal items located in those areas.  No advance notice to the inmate is necessary and no advance approval from the inmate is necessary.  In addition, the inmate is not entitled to be present when I conduct the search authorized by the above regulation.  The post orders for officers who work on Unit 10-2 required officers to supervise inmates who lived on the unit, conduct random patrols on the unit, conduct pat searches on inmates, perform room inspections and to conduct searches in inmate rooms."

(Wallace Decl., p. 2, ¶ 6.)

This appears to be a reasonable summation of a correctional officer's responsibilities and authorities, and Plaintiff has not shown otherwise.  Most of Wallace's allegedly "retaliatory" actions fit easily into his description of his job.  Plaintiff alleges that he was "stalked," but Wallace was required to keep a close eye on inmates.  Plaintiff accuses Wallace of eavesdropping, but that too is part of a correctional officer's job.  Plaintiff also complains that Wallace searched his personal property, but again, that was something Wallace was supposed to be doing.  Wallace was required to watch inmates, monitor their behavior, and periodically inspect their property.  That is what Wallace did.  (Wallace Decl., p. 5, ¶s 16-17.)

Plaintiff apparently believes that some of Wallace's alleged activities somehow exceeded his authority, and can properly be characterized as "retaliation."  However, Plaintiff has not offered any allegations or evidence that could satisfy the "but for" requirement.  In other words, Plaintiff has not shown that Wallace did anything that he would not have done "but for" a retaliatory motive.

Plaintiff's claims against Wallace are not based on the more commonplace allegations of retaliatory discipline or retaliatory transfer.  As discussed above, a retaliation claim can be predicated on other actions (besides discipline or transfer) that adversely affect a prisoner, but only if the prisoner can show that the actions at issue (a) were performed for a retaliatory purpose, and not some other legitimate penalogical reason, and (b) would likely have a chilling effect on the First Amendment activities of an inmate of ordinary sensibilities.  See Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995) ("we should 'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered

20

legitimate penalogical reasons for conduct alleged to be retaliatory") (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)); Lewis, 486 F.3d at 1029 (to sustain a retaliation claim, a prisoner must "prove that he engaged in protected activity and that defendants, to retaliate for the protected activity, took adverse action against [the prisoner] that would chill a person of ordinary firmness from engaging in that activity").

In this case, most of Wallace's allegedly retaliatory actions served clearly legitimate purposes – i.e., protecting inmates from predatory misbehavior, reducing the dangers posed by contraband, and enforcing prison regulations.  To the extent that Wallace's allegedly retaliatory actions may not have served legitimate purposes, (e.g., making "snide" remarks, waking Plaintiff while he was napping, and switching the locks on Plaintiff's locker[7]), the Court finds that such innocuous actions would not dissuade an inmate of ordinary firmness from exercising his constitutional rights.[8]  Thus, the Court concludes that Plaintiff has not presented any sustainable retaliation claim against Defendant Wallace.

D.  Claims Against Defendants Lewis and Bakker

Plaintiff's retaliation claims against Defendants Lewis and Bakker will be considered together, because the claims against these two Defendants are nearly identical.

**(i) The Code 305 Violation**

Lewis and Bakker allegedly made up the UDC that found Plaintiff guilty of the Code 305 violation, (for "possession of anything unauthorized"), which was charged by Defendant

---

[7]  Plaintiff's lock-switching allegation appears to be based on pure speculation. (See Complaint, p. 15, ¶s 108-109.)

[8]  Wallace obviously did not dissuade Plaintiff himself from exercising his constitutional rights.

Harcey in September 2008.  Plaintiff claims that the ruling by Lewis and Bakker was made

in retaliation for Plaintiff's previous ARCs against other correctional officers.  (Complaint,

p. 8, ¶s 48-50; pp. 23-24, ¶ 152.)    However, the Court has already determined that the

UDC's decision on the charged offense is well supported by the record.  (See Discussion,

pp. 12-14, supra.)  Therefore, Plaintiff cannot sustain a retaliation claim against Lewis and

Bakker based on that matter.  See Henderson, 29 F.3d at 469 (finding that there is at least

some evidence to support a disciplinary ruling "essentially checkmates" any retaliation

claim based on that ruling).

### (ii) Refusal to Inspect Cell; Referral to DHO

Plaintiff alleges that in February 2009, he asked Lewis and Bakker to inspect his

room.  He apparently hoped that such an inspection would somehow preclude Harcey from

charging him with a "safety and sanitation" violation.  (Complaint, p. 9, ¶ 62.)  However,

Plaintiff has made no effort to explain why Defendants' seemingly innocuous refusal to

inspect his room should be viewed as "retaliation."  Furthermore, Lewis and Bakker have

furnished a reasonable, non-retaliatory, explanation for refusing to inspect Plaintiff's room,

namely because "a member of the UDC cannot be personally involved in any disciplinary

proceeding as a witness or an investigating officer."  (Lewis Decl., p. 4, ¶ 15; Bakker Decl.,

p. 4, ¶ 13.)

Plaintiff also claims that Lewis and Bakker retaliated against him by referring

Harcey's "safety and sanitation" incident report to a DHO for a hearing.  This claim fails for

two reasons.  First, as Lewis and Bakker have properly pointed out, they did not initiate the

"safety and sanitation" incident report, and they did not make any ruling on the alleged

offense.  Lewis and Bakker merely referred the issue to a DHO in accordance with BOP

policy.  (Lewis Decl., p. 5, ¶ 15; Bakker Decl., p. 4, ¶ 13.)  Second, the Court has already determined that even though Harcey's "safety and sanitation" charge ultimately was dismissed, there was at least some evidence to support the charge.  (See Discussion, pp. 14-16, supra.)  Therefore, Plaintiff cannot maintain a retaliation claim against Lewis and Bakker based on Harcey's "safety and sanitation" charge.

### (iii) Threat of Retaliation

Plaintiff alleges that:

"On March 25, 2009, [Plaintiff] was met by S.I.S. Miller, Capt. Hansen, and Counselors Lewis and Bakker and threatened with an incident report for filing complaints."

(Complaint, p. 11, ¶ 76.)

The Court recognizes that the mere threat of retaliation for engaging in constitutionally protected activity can give rise to an actionable retaliation claim.  Burgess, 39 F.3d at 218 ("a threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures").  To be actionable, however, the threat of retaliation "would have to dissuade a plaintiff from engaging in protected action in the future." Kundratic v. Thomas, 407 Fed.Appx. 625, 628 (3rd Cir. 2011) (unpublished opinion); see also Lewis, 486 F.3d at 1029 (prisoner's retaliation claim was properly dismissed on summary judgment because prisoner failed to show that alleged retaliatory conduct "would chill an inmate of ordinary firmness from filing grievances").

Plaintiff's single sentence allegation that Lewis and Bakker "threatened [him] with an incident report" does not support a retaliation claim that can survive summary judgment. This brief, vague and conclusory allegation is simply not sufficient.  See Flittie v. Solem, 827 F.2d 276, 281 (8th Cir. 1987) (retaliation claim is not actionable if based on allegations

23

that "are simply too broad and conclusory").  Moreover, the alleged threat is not specifically attributed to either Lewis or Bakker.  Because of the way the allegation is phrased, it is by no means clear that either Lewis or Bakker actually made any threat at all; the threat could have been made by only Miller or Hansen.   Indeed, both Lewis and Bakker have affirmatively declared that they "never engaged in any harassment or retaliation against" Plaintiff.  (Lewis Decl., p. 4, ¶ 14; Bakker Decl. p. 4, ¶ 14.)  Plaintiff has made no effort to counter those affirmations in his response to Defendants' summary judgment motion. Finally, Plaintiff has not shown that any alleged "threat" by Lewis or Bakker, (if there was one), would have been likely to deter an inmate of normal resolve from filing a truly valid grievance.

For the reasons discussed above, the Court finds that Defendants Lewis and Bakker are entitled to summary judgment on Plaintiff's retaliation claims against them.

E.  Claims Against Defendant Miller

Plaintiff's complaint is sprinkled with vague allusions to Defendant Todd Miller, but Plaintiff has failed to clearly explain why he is attempting to sue Miller.  Giving the complaint the benefit of liberal construction, the Court finds that Plaintiff must be trying to bring the following claims against Miller:  (1) that Miller violated Plaintiff's rights to due process and access to the courts, by failing to properly address various administrative grievances that Plaintiff attempted to prosecute against other correctional officials at FMC-Rochester; (2) that Miller allegedly violated Plaintiff's constitutional rights, (although it is not clear which rights), by "coercing" Plaintiff to resolve a complaint against Defendant Harcey; and (3) that Miller retaliated against Plaintiff for filing administrative grievances, by threatening to place Plaintiff in segregated confinement if he filed more such grievances.  None of these claims

24

can survive Defendants' summary judgment motion.

### (i) Failure to Address Administrative Grievances

Plaintiff claims that he was deprived of his constitutional rights to due process and access to the courts, because Miller allegedly mishandled certain administrative grievances that Plaintiff presented to him.  (See Complaint, p. 5, ¶ 27; p. 11, ¶ 74.[9])  These claims must be rejected.

To state an actionable due process claim against Defendant Miller, Plaintiff must allege a set of facts showing that Miller caused him to be deprived of some constitutionally protected property or liberty interest, without affording him the procedural benefits of due process.  Ragan v. Lynch, 113 F.3d 875, 876 (8th Cir. 1997) ("[a] due process claim is cognizable only if there is a recognized liberty or property interest at stake"); Orr v. Larkins, 610 F.3d 1032, 1034 (8th Cir. 2010) (per curiam) ("'[i]n order to prevail on a Fourteenth Amendment due process claim, [the plaintiff] must first demonstrate that he was deprived of life, liberty, or property by government action'") (quoting Phillips v. Norris, 320 F.3d 844, 846 (8th Cir.2003)).

Here, Plaintiff has not presented an actionable due process claim against Defendant Miller, because he has not shown that Miller deprived him of any protected liberty or property interest.  Plaintiff has merely alleged that Miller mishandled one or more of his numerous administrative grievances; he has made no effort to show that he was thereby

---

[9]  Plaintiff also alleges that Miller mishandled a grievance filed by another inmate, (Complaint, p. 10, ¶ 71), but that allegation obviously lends no support to the claim that Miller violated Plaintiff's own constitutional rights.  See Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (to state an actionable claim, "[a] prisoner must allege a personal loss[;]... [he] lacks standing to bring claims alleging mistreatment of others").

deprived of some specific interest that is protected by the Constitution. Because Plaintiff has not shown that Miller deprived him of any specific constitutionally protected interest, he has no grounds for bringing a due process claim against Miller.

An inmate cannot bring an "access to the courts" claim unless he pleads, (and ultimately proves), that he has been deprived of some specific opportunity to defend himself, or advance a viable legal claim, in some particular action. Lewis v. Casey, 518 U.S. 343, 351 (1996); Sabers v. Delano, 100 F.3d 82, 84 (8th Cir. 1996) (per curiam). A prisoner lacks standing to bring an access to the courts claim, unless he can show some "actual injury." Id. at 349. See also Klinger v. Department of Corrections, 107 F.3d 609, 617 (8th Cir. 1997) ("[i]n Lewis v. Casey, the Supreme Court held, based on principles of standing, that actual injury must be proven in order to prevail on an access-to-courts claim"). To satisfy the "actual injury" requirement, an inmate must identify some specific harm that is directly attributable to an alleged lost opportunity to litigate. Speculative injuries – i.e., injuries that might occur, or could have occurred – are not sufficient. See Hartsfield v. Nichols, 511 F.3d 826, 833 (8th Cir. 2008) ("[a]bsent an articulation of how the alleged wrongful conduct actually blocked [the prisoner's] access to filing a complaint, or caused a filed complaint to be deficient, [the prisoner's] alleged injuries are merely speculative").

Plaintiff has fallen far short of presenting an actionable claim against Defendant Miller for denial of access to the courts. Nothing in the record suggests that Miller's alleged mishandling of Plaintiff's administrative grievances caused Plaintiff to forfeit any specific claim or defense that might have otherwise been available to him. Because Plaintiff has not shown any "actual injury," his access-to-the-court claims against Miller must be

26

dismissed.

### (ii) Coercion Claim

One isolated allegation in Plaintiff's complaint reads as follows:

"In September 2008, Plaintiff was coerced by S.I.S. Miller to informally resolve the previous unknown complaint against Harcey and another complaint for which he had never received receipts, in order to be released from SHU, several months after having filed this complaint and without ever receiving a receipt in violation of policy."

(Complaint, p. 8, ¶ 52.)  No actionable claim for relief can be found in this inscrutable paragraph.  Plaintiff has not adequately described what, specifically, Miller allegedly did (or failed to do), nor has he shown how Miller's alleged misdeeds, (whatever they might have been), allegedly violated his rights under some particular provision of the federal Constitution, or some specific federal legal doctrine.  See Martin v. Aubuchon, 623 F.2d 1282, 1286 (8th Cir. 1980) (although federal courts must "view pro se pleadings liberally, such pleadings may not be merely conclusory: the complaint must allege facts, which if true, state a claim as a matter of law"); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) (a complaint fails to state a cause of action if it does not allege "enough facts to state a claim to relief that is plausible on its face").

### (iii) Threats/Retaliation

Plaintiff's complaint also includes a smattering of vague allegations of threats and retaliation by Miller.  (Complaint, p. 3, ¶ 10; p. 11, ¶ 76; p. 14, ¶ 98; p. 17, ¶ 118.)  The only such allegations that include any specific details are at paragraphs 76 and 98 of the complaint.   Plaintiff's other allegations of threats and retaliation from Miller are too conclusory to be actionable.  See Flittie, 827 F.2d at 281 (allegations that "are simply too

broad and conclusory" will not support retaliation claim); Ervin v. Ciccone, 557 F.2d 1260, 1262 (8th Cir. 1977) (same).

In paragraph 76 of the complaint, Plaintiff broadly alleges that four correctional officers "threatened [him] with an incident report for filing complaints." This allegation has already been found to be inadequate for reasons discussed above. (See Discussion, pp. 23-24, supra.) To reiterate, Plaintiff has not attributed any particular threat to any particular correctional official. Because of that lack of specificity, Plaintiff has not shown that Defendant Miller himself actually said or did anything that would constitute an actionable threat – i.e., a threat that would deter an inmate of ordinary firmness from seeking relief under the prison grievance procedures. Moreover, Miller has expressly denied that he threatened Plaintiff, (Miller Decl., p. 4, ¶ 11), and Plaintiff's response to Defendants' summary judgment motion offers no evidence to rebut that assertion.

In paragraph 98 of the complaint, Plaintiff alleges that Wallace told him that Miller had said "if 'Jones wanted to stay out of the 'bucket,' he had better stop filing petty complaints.'" This allegation is pure hearsay, and as such, it is effectively refuted by Miller's unopposed declaration that he did not make any such threat. (Miller Decl., p. 8, ¶ 24, ["I never encouraged Wallace to harass Jones"].)[10]

---

[10] Even if Miller had made the statement allegedly attributed to him by Wallace, (despite Miller's denial), Plaintiff should not have felt threatened by that statement, because Miller's purported warning pertained only to "petty complaints." Such a warning might have been beneficial to Plaintiff, because he might have been on the verge of losing his ability to file administrative grievances. The Eighth Circuit Court of Appeals has observed that

"Prisoners must understand that if they abuse the system by repeatedly filing ill-founded grievances, reasonable limitations may be placed on their access to the procedure, just as reasonable limitations may be placed on prisoners' access to the courts when they abuse the judicial process by repeatedly filing

F.  Claims Against Defendant Hare

Plaintiff's claims against Defendant Jason Hare are based on two matters described in the complaint.  First, Plaintiff alleges that he gave Hare an administrative grievance pertaining to Defendant Harcey, which accused Harcey of "trashing" Plaintiff's cell in retaliation for his complaint that Harcey shut off the lights too early.  Defendant Hare allegedly "falsified the response" to Plaintiff's grievance, meaning (as far as the Court can tell) that Hare allegedly denied the grievance based on a misstatement of the apposite facts.  (Complaint, p. 6, ¶s 35-38.[11])

Second, Plaintiff alleges that Hare filed an incident report that accused Plaintiff of violating prison rules by wearing a beaded necklace with two religious medallions.  In that matter, Plaintiff was initially found guilty of possessing unauthorized property, but after further administrative review, that ruling was reversed and expunged because of a "procedural error."  Plaintiff now claims that Hare's incident report regarding the necklace was retaliatory, and violated his First Amendment right to religious freedom.  (Complaint, pp. 18-20, ¶s 126-140.)

---

frivolous claims."

Sprouse, 870 F.2d at 452.  Plaintiff's own allegations show that he has been a prolific administrative complainer, (Complaint, p. 3, ¶ 6), and if he was at risk of losing his access to the prison grievance procedure, a word of caution from Miller might have been helpful.

[11]  Plaintiff's first claim against Hare is based on the baffling allegation that –

"Hare falsified the response, and presumably his investigation/report, by claiming that Plaintiff admitted to him that Jones had not had any conversations with the unit officer and other statements about Harcey never searching Jones which Jones had never made."

(Complaint, p. 6, ¶ 37.)

### (i) Response to Complaint Against Harcey

Plaintiff's first claim against Defendant Hare, i.e., that he "falsified the response" to the grievance against Harcey, must be dismissed because it lacks any legal foundation. More specifically, Plaintiff has not shown – or even alleged – that Hare violated any of his federal constitutional rights by his handling of the administrative grievance against Harcey.

Plaintiff cannot claim that Hare's response to the Harcey grievance violated his right to due process, because he has not shown that he was deprived of any constitutionally protected liberty interest.  As explained by the Eighth Circuit Court of Appeals –

> "'In order to prevail on a Fourteenth Amendment due process claim, [the plaintiff] must first demonstrate that he was deprived of life, liberty, or property by government action.'  Phillips v. Norris, 320 F.3d 844, 846 (8th Cir.2003). To show he was deprived of a protected liberty interest, [a prisoner] must identify conditions that impose 'atypical or significant hardship ... in relation to the ordinary incidents of prison life.' Sandin v. Conner, 515 U.S. 472, 484... (1995)."

Orr, 610 F.3d at 1034.

Plaintiff has not shown that Hare's handling of the grievance against Harcey resulted in any "atypical or significant hardship in relation to the ordinary incidents of prison life." Therefore, Plaintiff has not shown that he was deprived of a protected liberty interest, which means that he has not presented an actionable due process claim against Hare.

Furthermore, the Eighth Circuit Court of Appeals has held that "the federal regulations providing for an administrative remedy procedure do not in and of themselves create a liberty interest in access to that procedure."  Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991).  Therefore, mishandling a prisoner's administrative grievance does not, by itself, violate due process.  Id.  See also  Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) (prisoner's "complaint failed to state a claim because no constitutional right was violated

30

by the defendants' failure, if any, to process all of the grievances he submitted for consideration").

The Court further finds that Hare's alleged mishandling of Plaintiff's administrative grievance against Harcey did not deprive Plaintiff of his constitutional right of access to the Court.   Even if Hare did wrongly deny Plaintiff's grievance, (a purely hypothetical assumption), Plaintiff was still able to pursue his grievance in court.[12]  Because Hare did not cause any "actual injury" to Plaintiff's substantive legal rights, Hare cannot be sued for depriving Plaintiff of his constitutional right of access to the courts.  See Johnson, 452 F.3d at 973 (to sustain a claim of denial of access to the courts, a prisoner "must prove that he suffered an actual injury or prejudice as a result of the alleged denial of access").

### (ii) Retaliation Claim

Hare is also being sued for filing an incident report based on Plaintiff's possession of the necklace with the religious medallions.   Plaintiff claims that the incident report violated his constitutional rights, because it was filed in retaliation for Plaintiff's unwillingness to voluntarily resolve various ARCs that he had previously filed.  (Complaint, pp. 19-20, ¶s 132-136.)

Hare contends that the incident report was justified, not retaliatory, because Plaintiff was not authorized to possess the necklace at issue.  (Hare Decl., p. 3, ¶ 9.)  Plaintiff has not effectively refuted that assertion.  Moreover, a UDC upheld the incident report issued by Hare, and disciplined Plaintiff for possessing unauthorized property.  (Id., p. 3, ¶ 8.)

---

[12] Plaintiff may have feared that Hare's ruling would somehow prevent him from exhausting his administrative remedies, and thereby prevent him from suing Harcey for retaliation.  However, Plaintiff's retaliation claim against Harcey has not been barred due to non-exhaustion.  (See n. 2, supra.)

As discussed above, "an inmate's retaliation claim fails 'if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule.'" <u>Bandy-Bey v. Crist</u>, 578 F.3d 763, 766 (8th Cir. 2009) (quoting <u>Hartsfield</u>, 511 F.3d at 829).  "If the discipline which a prisoner claims is retaliatory was in fact imposed for an actual violation of prison rules or regulations, the prisoner's claim must fail." <u>Johnson</u>, 452 F.3d at 973.  In this case, the record shows that Hare's allegedly retaliatory incident report was filed for an actual violation of a prison rule – "possession of anything not authorized."  Therefore, Plaintiff's retaliation claim against Hare cannot succeed.

The Court recognizes that Hare's incident report was ultimately dismissed. However, that report was dismissed only because of a "procedural error."[13]  (Plaintiff's Exhibits, p. 78.)  Therefore, the dismissal of the incident report does not alter the finding that Plaintiff actually did violate a prison rule.  As previously noted, "[t]he fact that the conduct violation was later expunged does not mean that there was not some evidence for its imposition." <u>Moots</u>, 453 F.3d at 1023.  Here, there was some evidence that Plaintiff was guilty of the offense charged in Hare's incident report.  Simply put, Plaintiff did possess something that was not authorized – the necklace.  Therefore, Plaintiff cannot sustain a retaliation claim against Hare based on the issuance of the report, even though the report was later set aside because of a procedural error.

### (iii) First Amendment Claim

---

[13]  During the relevant administrative remedy proceedings, Plaintiff contended that Hare's incident report should be dismissed because it was untimely, and it was therefore procedurally defective.  In Plaintiff's words, "this 'shot' was not given in the properr [sic] time period, and Lt. Hare waived and forfeited his right to give me a shot after the first 24 hours had passed." (Plaintiff's Exhibits, p. 75.)  The incident report was dismissed because of this "procedural error," (i.e., untimeliness), and <u>not</u> because Plaintiff was innocent.

Plaintiff claims that Hare's incident report for the necklace was not only retaliatory, but also deprived him of his First Amendment right to freely exercise his religious beliefs. To sustain such a claim, Plaintiff would have to plead and prove that Hare interfered with some specific religious belief that was sincerely held by Plaintiff. Hayes v. Long, 72 F.3d 70, 73 (8th Cir. 1995) ("the inmate must establish both the existence of a sincerely held religious belief and the infringement upon that belief by the challenged act or regulation"); Murphy v. Missouri Dept. of Corrections 372 F.3d 979, 983 (8th Cir.) (when analyzing a prisoner's freedom of religion claim, a court must "consider first the threshold issue of whether the challenged governmental action 'infringes upon a sincerely held religious belief'"), cert. denied, 543 U.S. 991 (2004), (citing Hamilton v. Schriro, 74 F.3d 1545, 1550 (8th Cir.1996)).

In this case, Plaintiff has made no effort to show that he holds any particular religious beliefs, (sincerely or otherwise), and Defendants have introduced evidence showing that, in fact, Plaintiff has not previously asserted that he holds any such beliefs. (Hare Decl., p. 3, ¶ 11.)  Furthermore, even if Plaintiff does hold some particular religious beliefs, he has made no effort to show that the necklace allegedly seized by Hare was a necessary component of his religious faith.  Thus, the Court finds that Plaintiff has failed to present an actionable claim against Hare based on the First Amendment's freedom of religion clause.

G.  Other Matters

Plaintiff's complaint mentions several other matters that have not yet been specifically addressed.  These matters warrant little attention, (for reason cited below), but they will be mentioned to assure the parties that they have not been overlooked.

33

### (i) Prison Transfer

When Plaintiff was drafting his complaint, he anticipated that he might soon be transferred from FMC-Rochester to another federal prison facility.  Not long after the complaint was filed, Plaintiff was indeed transferred to a facility in North Carolina.  It could be inferred from some of the allegations in the complaint, that Plaintiff believes his prison transfer was retaliatory.  However, the complaint does not state an actionable retaliatory transfer claim against any of the named Defendants, because there are no allegations showing that any of the named Defendants was personally responsible for the transfer. Nor are there any allegations showing that Plaintiff would have remained at FMC-Rochester "but for" the retaliatory intentions of some prison official (who is not identified).[14]  Therefore, Plaintiff has not presented an actionable retaliatory transfer claim.

### (ii) Sexual Orientation

Plaintiff has alleged that Defendant Harcey filed incident reports against five homosexuals, including Plaintiff.  (Complaint, p. 7, ¶ 47.)  Based on that allegation, Plaintiff claims that Harcey "has clearly demonstrated a pattern of discrimination against inmates who are homosexual in violation of federal statutes and policies."  (Id., p. 22, ¶ 146.) However, if Plaintiff actually intended to sue Harcey for discriminating against him based on sexual orientation, that claim has been effectively disproven by Harcey's declaration, in which he states:

> "This allegation is incorrect.  I never issued an incident report to [Plaintiff] or to any other inmate simply because of homosexual sexual orientation. During the time I worked on the unit, I issued 19 incident reports to inmates

---

[14]  Moreover, the Court finds nothing to suggest that Plaintiff actively opposed his prison transfer, and he is longing to return to FMC-Rochester.

and most of the inmates who received incident reports were inmates who were not overtly homosexual."

(Harcey Decl., p. 6, ¶ 24.[15])   Plaintiff has offered no evidence to contradict Harcey's

Declaration.  Therefore, if Plaintiff intended to bring a sexual orientation discrimination claim

against Harcey, that claim must be dismissed on summary judgment.

### (iii) Discarded Clothing

Plaintiff alleges that Harcey discarded some of his underwear and a t-shirt.

(Complaint, p. 8, ¶ 51.)  It is unclear whether Plaintiff is actually attempting to present an

independent claim to recover the value of that allegedly discarded property.  If Plaintiff

intended to bring such a claim, the claim must fail be rejected, because he has not

identified any legal basis for it.[16]

---

[15] Harcey's declaration also indicates that Plaintiff did not exhaust his administrative remedies for any discrimination claim that he might be trying to bring against Harcey here. (Harcey Decl., pp. 6-7, ¶ 24.)

[16] The Court specifically notes that the complaint does not purport to include any claim for damages under the Federal Tort Claims Act, ("FTCA").  Moreover, it appears doubtful that such a claim could be timely, and even if it were timely it probably would not be actionable.  See Ali v. Federal Bureau of Prisons, 552 U.S. 214 (2008) (holding that FTCA does apply to claims based on property detained by BOP correctional officers). Plaintiff's complaint also does not present any identifiable due process claim, and in any event, Plaintiff could not maintain a due process claim based on his alleged property loss, because the BOP's administrative remedy procedures provide an adequate post-deprivation remedy.  As explained in Butler v. United States, Civil No. 09-147 (PAM/AJB) (D.Minn. 2009) (Magnuson, J.), 2009 WL 3028902 at *2:

"The Supreme Court has held that an unauthorized deprivation of property by a government official, whether negligent or intentional, is not a due process violation so long as there is some other meaningful post-deprivation remedy available....  As an inmate at a BOP facility, [the plaintiff] can seek relief under the BOP's administrative remedy procedures, set forth at 28 C.F.R. §§ 542.10-19....  Because a post-deprivation remedy is available, [the plaintiff] has not suffered a violation of his due process rights."  (Citations omitted.)

### (iv) Failure to Process Administrative Grievances

Finally, Plaintiff's complaint mentions several incidents when prison officials allegedly failed to respond to administrative grievances that he submitted.  (Complaint, p. 4 , ¶ 16; p. 4, ¶ 20; p. 5, ¶ 27; p. 11, ¶s77-78; p. 12, ¶ 84; p. 14, ¶ 96; p. 14, ¶ 101; p. 15, ¶ 103; p. 15, ¶s 105-106; p. 16, ¶s 112-113; p. 17, ¶s 120-122; p. 23, ¶s149-150.)  However, as the Court has already pointed out, a prisoner has no constitutional right to receive a response to his administrative grievances.   Buckley, 997 F.2d at 495.  Furthermore, Defendants' alleged failure to respond to Plaintiff's administrative grievances has not been prevented him from pursuing any of the claims advanced in his present complaint.  (See n. 2, supra.)   Therefore, Plaintiff cannot successfully maintain that Defendants deprived him of his right of access to the courts because of their alleged failure to properly respond to his administrative grievances.

## IV.  CONCLUSION

For the reasons discussed above, the Court concludes that none of the claims that Plaintiff has attempted to bring in his complaint can survive Defendants' motion for summary judgment.   The Court will therefore recommend that Defendants' summary judgment motion be granted, and that this action be dismissed with prejudice.

## V.  RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendants' Motion for Summary Judgment, (Docket No. 16), be **GRANTED**; and

    2.  This action be **DISMISSED WITH PREJUDICE**.

Dated: February 9, 2012

                                 s/ Arthur J. Boylan
                                 ARTHUR J. BOYLAN
                                 Chief United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.   This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before February 23, 2012.